IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Michael Horejs, *et al.*, | : | |
| | : | Case No. 1:19-cv-855 |
| Plaintiffs, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | Order Granting Motion for Summary |
| David Kitchin, *et al.*, | : | Judgment |
| | : | |
| Defendants. | : | |

This matter is before the Court on Defendants' Motion for Summary Judgment. (Doc. 47.) In this case, Plaintiffs Michael and Lauren Horejs allege that Defendants David and Nancy Kitchin breached a contract and made fraudulent misrepresentations about mold and water intrusion issues in connection with the sale of their residential property at 8695 Twilight Tear Lane, Cincinnati, Ohio 45249 ("the Property") to the Horejses. The Kitchins have moved for summary judgment following discovery. Because no material facts are in dispute and the Kitchins are entitled to judgment as a matter of law, the Court will **GRANT** summary judgment.

I. BACKGROUND

A. The Property Prior to Ownership by the Kitchins

Non-parties Fe and Lito Alino resided at the Property from 1988 until 2001. (Doc. 51 at PageID 1500.) The Alinos hired a contractor to finish part of the basement of the house during the 1989–1990 timeframe. (*Id.* at PageID 1501.) Fe Alino stated in her Affidavit dated February 23, 2002 that the Alinos did not experience or were not aware of "any problems in the house associated with outside water intrusion at any level of the house; sewer backup issues; structural and/or settling problems in the basement; and/or mold and mold odor problems in the basement." (*Id.*) She also stated that they did not "perform any work in the basement related to any of the

issues mentioned above, including removing basement walls, removing foil sheeting in the basement, installing and/or applying leveling compound to the basement floor, or any other such work." (*Id.*) However, she clarified in a second Affidavit dated May 6, 2022 that she and her husband "did not continuously observe the work being performed" by the contractors during the basement finishing project, so she did not know "how the work was done." (Doc. 61 at PageID 1712–1713.) She knew only that that "framing and drywall were installed over the concrete basement walls" and that a "drop ceiling was also installed." (*Id.* at PageID 1713.)

**B.      The Kitchins Own and Reside at the Property**

The Kitchins purchased the Property in 2001 and lived there for approximately seventeen years. (Doc. 47-1 at PageID 1424; Doc. 47-2 at PageID 1433.) The Kitchins asserted that they had no knowledge "of water intrusion events in the basement" during the years they lived in the home. (Doc. 47-1 at PageID 1425; Doc. 47-2 at PageID 1434.) They further asserted that they did not "ever experience any mold or observe any mold anywhere in the home." (Doc. 47-1 at PageID 1425; Doc. 47-2 at PageID 1434.) Relatedly, they asserted that they did not "ever experience a sewer backup or sewer related issues." (Doc. 47-1 at PageID 1426; Doc. 47-2 at PageID 1435.) Finally, in regard to the exterior basement walls, the Kitchins stated that they had "absolutely no knowledge of any brick foil sheeting being removed or the lack thereof behind the basement walls, nor did [they] ever repair or remove or replace any of the drywall in the basement from the time [they] owned the residence to the day [they] moved out." (Doc. 47-1 at PageID 1426; Doc. 47-2 at PageID 1435.)

The Kitchins described doing limited work in the basement of the home. A home inspector retained by the Kitchins when they purchased their home told them that the basement floor was not level. (Doc. 47-1 at PageID 1424; Doc. 47-2 at PageID 1433.) They retained

contractors to level the floor so they could put up a wall and create a bedroom in the basement. (Doc. 47-1 at PageID 1424; Doc. 47-2 at PageID 1433.)  The Kitchins stated that the contractors told them there were no structural problems with the basement slab.  (Doc. 47-1 at PageID 1424; Doc. 47-2 at PageID 1433.)  Later, the Kitchins removed and replaced the carpeting in the basement in 2007.  They asserted that they saw no signs at that time of a defective slab nor of mold or water intrusion.  (Doc. 47-1 at PageID 1425; Doc. 47-2 at PageID 1434.)

In 2016, the Kitchins noticed brick mortar cracking in the front face of the house and in the chimney area.  (Doc. 47-1 at PageID 1425; Doc. 47-2 at PageID 1434.)  They enlisted the services of a structural engineer to inspect the home.  (Doc. 47-1 at PageID 1425; Doc. 47-2 at PageID 1434.)  The structural engineer, Tracy Mitchell, PE, provided a written report and recommended only minor repairs:

> Based upon the size, location, and patterns of the cracks in the brick veneer I recommend that the old mortar be completely removed in small sections and new mortar tuck pointed to restore the bond between the bricks.  After these repairs are made if any new movement takes place it will be evident by similar cracks between the bricks as seen now.  If this happens then the installation of steel piers below the foundations may be required.

(Doc. 34 at PageID 261.)

**C.      Sale of the Property to the Horejses and the Residential Property Disclosure Form**

The Kitchins put the Property up for sale in 2018.  In connection with the sale, the Kitchins completed a State of Ohio Residential Property Disclosure Form on May 7, 2018.  The Kitchins denied "actual knowledge" of water problems in the house:

> **A) WATER SUPPLY:** . . . Do you know of any previous or current leaks, backups or other material problems with the water supply system or the quality of the water?  ☐Yes ☒No  If Yes, please describe and indicate any repairs completed (but not longer than the past 5 years): _____
>
> * * *

> **B) SEWER SYSTEM**: . . . Do you know of any previous or current leaks, backups or other material problems with the sewer system servicing the property? Yes☐ No☑ If "Yes", please describe and indicate any repairs completed (but not longer than the past 5 years): _____
>
> * * *
>
> **D) WATER INTRUSION:** Do you know of any previous or current water leakage, water accumulation, excess moisture or other defects to the property, including but not limited to any area below grade, basement or crawl space? Yes☐ No☑ If "Yes", please describe and indicate any repairs completed: _____
>
> Do you know of any water or moisture related damage to floors, walls or ceilings as a result of flooding; moisture seeping; moisture condensation; ice damming; sewer overflow/backup; or leaking pipes, plumbing fixtures, or appliances? Yes☐ No☑ If "Yes", please describe and indicate any repairs completed: _____
>
> Have you have had the property inspected for mold by a qualified inspector? Yes☐ No☑
>
> * * *
>
> **Purchaser is advised that every home contains mold. Some people are more sensitive than others. If concerned about this issue, purchaser is encouraged to have a mold inspection by a qualified inspector.**
>
> * * *
>
> **K) DRAINAGE/EROSION:** Do you know of any previous or current flooding, drainage, settling or grading or erosion problems affecting the property? Yes☐ No☑
>
> If "Yes", please describe and indicate any repairs, modifications, or alternations to the property or other attempts to control any problems (but not longer than the past 5 years) : _____

(Doc. 2 at PageID 70–72 (emphasis in the original).)

Conversely, the Kitchins acknowledged a prior issue with the foundation and a skylight leak, which they addressed:

> **C) ROOF:** Do you know of any previous or current leaks or other material problems with the roof or rain gutters? ☑Yes ☐No If yes, please describe and indicate any repairs completed (but not longer than the past 5 years): <u>LEAK</u>

> AROUND THE HALL BATHROOM SKYLIGHT, REPAIRED BY TECTA AMERICA ROOFING ON 2.26.18 – NO LEAKS SINCE.
>
> * * *
>
> **E): STRUCTURAL COMPONENTS (FOUNDATION, BASEMENT/CRAWL SPACE, FLOORS, INTERIOR AND EXTERIOR WALLS):** Do you know of any previous or current movement, shifting, deterioration, material cracks/settling (other than visible minor cracks or blemishes) or other material problems with the foundation, basement/crawl space, floors, or interior/exterior walls?
>
> ☑Yes ☐No  If "Yes", please describe and indicate any repairs, alterations or modifications to control the cause or effect of any problem identified (but not longer than the past 5 years): NOTICED A CRACK IN THE CHIMNEY BRICKS – HAD A STRUCTURAL ENGINEER (TRACY MITCHELL, PE) TO ASSESS ON 10.5.16 – FOUNDATION WAS REPORTED FINE – HAD GARY KING, MASTER BRICK MASON REPAIR CRACKS.

(*Id.* at PageID 70–71 (emphasis in the original).)  The Kitchins both initialed and dated the first four pages of the disclosure form and then signed the last page. (*Id.* at PageID 69–73.)

The Horejses entered into a Contract to Purchase the Property on July 7, 2018. (*Id.* at PageID 56–63.) The Kitchins provided the Horejses with a copy of the Residential Property Disclosure Form, which the Horejses signed to acknowledge receipt. (*Id.* at PageID 58, 73.) In the Contract to Purchase, the Horejses waived the right to conduct inspections of the Property "to determine the material physical condition of the house, land, improvements, fixtures, equipment, any additional structures, and any hazardous conditions on the Real Estate[,]" other than the right to "walk-through the property with in [*sic*] 14 days of contract acceptance." (*Id.* at 59.) The Contract to Purchase provided that the Kitchins would "**NOT BE RESPONSIBLE FOR AN UNKNOWN AND/OR DISCLOSED DEFECTS**" and that the Horejses had been "**ADVISED BY REALTOR® TO CONDUCT INSPECTIONS OF THE REAL ESTATE**." (*Id.* (emphasis in the original).) The Kitchins provided the Horejses with a copy of the 2016 structural engineer's report prior to the completion of the sale. (Doc. 42 at PageID 1077.) The

Horejses made an "as is" offer to purchase—to accept the Property without modification or repairs—based on the representations made by the Kitchins. (Doc. 37 at PageID 725.) The Kitchins vacated the Property on September 11, 2018, the date the sale closed. (Doc. 35 at PageID 330.)

The Horejses walked through the home four times prior to closing, with two of those visits happening before they put in their offer. (Doc. 37 at PageID 720.) They walked through each room of the home and the basement. Lauren Horejs testified that she noticed an odor in the basement on the second and subsequent walkthroughs, but that Nancy Kitchin attributed the odor to their family's cat and dog, including specifically the cat litter box. (*Id.*) Lauren Horejs described it as "an off-putting smell," but she "couldn't put [her] finger on exactly what it was." (*Id.*) She did not notice any water stains or signs of water intrusion or water leaks. (*Id.* at PageID 720, 724.) Lauren Horejs's father, Rick Arquilla, the former chief operating officer at Roto-Rooter, also walked through the home before the Horejses made the offer to purchase the Property. (Doc. 46 at PageID 1309.) He did not notice a smell nor see evidence of water stains during his walk through. (*Id.* at PageID 1310.)

**D.     The Horejses Detect Mold and Water Intrusion in the House**

The Horejses continued to notice an odor in the basement after they closed on the purchase of the Property. (Doc. 37 at PageID 729.) They hired Stanley Steamer to clean the carpet, but that did not eliminate the odor. (*Id.*) The odor increased when the home furnace was turned on in late October or November 2018, and it spread throughout the house. (*Id.*) Rick Arquilla then suggested that they hire Roto-Rooter to check for mold. (*Id.* at PageID 729–730; Doc. 46 at PageID 1312.)

Jason Garrett, a field supervisor with Roto-Rooter, came to inspect the house for mold.

(Doc. 39 at PageID 862, 865.) He visibly detected the presence of mold on the baseboards in the basement, on the back of drywall and stud framework, on the back of risers on the steps, on the carpet tack strips, and on personal items in the storage room. (*Id.* at PageID 865–867.) He also detected the presence of water in the basement playroom on the carpet and pad using a thermal camera. (*Id.* at PageID 865.) He discovered that a humidifier attached to the HVAC unit was turned off and that the filter was rotten and covered with mold. (*Id.* at PageID 870.) The humidifier had been sealed off behind drywall in the utility room in the basement. (*Id.* at PageID 880.)

Garrett returned to the house several times. He concluded that there were two sources of water in the basement of the Property. The first source was hydrostatic pressure on the foundation slab of the house that caused cracks and allowed water seepage. (*Id.* at PageID 869.) When Garrett and Anthony Jordan used a laser measure, they determined that there was a three-inch dip in the foundation slab. (*Id.* at PageID 870.) The second source was a leaking drainpipe or stack running vertically on the back wall of the kitchen. (*Id.* at PageID 869, 876.) The stack leak had caused an eight square foot section of the kitchen floor to have cupped. (*Id.* at PageID 869.) Garrett acknowledged that he could not "speak for" the Kitchins as to whether they had knowledge of the water intrusion issues and the mold in the house. (*Id.* at PageID 880.)

Steven Bostic, a forensic architect, noted other water intrusion problems about which he believed the prior owners would have been aware. First, he determined that code-required window and door sill flashings were not installed during the house construction. (Doc. 43 at PageID 1106–1107, 1149.) He found that significant damage or rotting on the plywood under the doors and windows after the basement had been deconstructed. (*Id.* at PageID 1149; Doc. 38 at PageID 755, 839.) Second, he learned from Roto-Rooter and saw evidence that foam

sheathing had been removed from the back exterior wall of the house. (*Id.* at PageID 1106, 1148.) Finally, he determined that the foam sheathing was accessed and removed from the interior of the home, as opposed to being removed from the exterior, because there was no sign that the brick masonry had been redone. (*Id.* at PageID 1106, 1148–1149.) He opined that the most likely reason that foam sheathing would be removed is that it had become water saturated and had to be taken out as part of a prior water or mold remediation project. (*Id.* at PageID 1106, 1148–1149.) He also noted that a leveling compound was used on the basement floor slab prior to the installation of carpet. (*Id.* at PageID 1111, 1149.) He stated that the use of the leveling compound would have added time and cost to the carpet installation, and it is something that the house owner would have known about. (*Id.* at PageID 1111, 1149–1150.) Bostic testified at his deposition that he was unable to determine the dates that defects would have been evident or when the work he described would have been completed. (*Id.* at PageID 1104, 1114.) As such, he did not know if the work he assumed had been done was completed during the time that the Kitchins owned the house. (*Id.* at PageID 1114.)

James Graham, a structural engineer retained by the Horejses, also speculated that the only reason to remove that sheathing was as part of a prior mold or water damage remediation project. (Doc. 38 at PageID 756, 773.) He also stated that he did not know who removed the sheathing. (*Id.* at PageID 756.)

Anthony Jordan, then a lead water mitigation technician for Roto-Rooter, participated in the remediation process. He deconstructed the basement by removing the carpet, baseboards, drywall, and walls. (Doc. 57 at PageID 1588, 1606–1607.) He found mold, primarily on the back wall of the house, but also on the kitchen wall and floor behind and underneath the cabinets. (*Id.*at PageID 1606–1607.) He then cleaned the areas containing the mold. (*Id.* at

PageID 1610–1611.) The remediation process took one month. (*Id.* at PageID 1612.)

Jordan signed and dated a March 27, 2019 statement in which he concluded that the Kitchins had to have known about previous water damage to the house. He gave several bases for his conclusion:

> Based on my Professional opinion, the homeowners previous to the Horejs' [*sic*] knew about the water damages that took place in this home.
>
> KITCHEN
>
> The dining area and kitchen hard wood floors are all the same finish, the hardwood has cupping & crowning along with separation; this was covered up with sanding and refinish work. What makes me believe a water loss occurred, is that only these areas were finished while the other areas were not finished.
>
> MAIN SEWER STACK
>
> The house is shifting and the main stack was cracked due to the stress on the stack. This looked like it was cracked for quite sometime.
>
> BATHROOM
>
> Mold was on the base boards. When lifting the ceiling tile there was microbial growth present.
>
> BAR
>
> Due to the house shifting, water was coming in from the deck, the wall was not sealed properly, lack of maintenance on tuck point. I shot a laser of the floor and it showed a 3 inch drop in the floor.
>
> KIDS PLAY AREA
>
> There was previous water damage in this area. There was evidence of new mortar done recently at the tuck points. There was evidence of new carpet and pad on the floor. In the walls, there was new framing, new insulation, and a vapor barrier added.

(Doc. 57-1 at PageID 1654.)[1]

---

[1] Jordan admitted at his deposition that he did not have "any actual knowledge whether a [floor] refinish was done" on the kitchen floor. (Doc. 57 at PageID 1620.) He testified that he assumed the main stack was cracked because of the house shifting, but he admitted that he is not structural engineer and that he believed there was probably other possible causes for a crack in the stack. (*Id.* at PageID 1621.) He thought the crack in the stack would cause visible

Finally, Kevin Saylor, then a plumbing technician at Roto-Rooter, did a forensic investigation of the sewer system at the Property on January 21, 2019 and February 15, 2019. (Doc. 50-1 at PageID 1454, 1466, 1472.) The camera inserted into the sewer line showed that the "system was flooded, bellied out, back pitched, [and] retaining water." (*Id.* at PageID 1461.)² The camera detected toilet paper, waste, and feces in the sewer pipe. (*Id.*) Saylor concluded that the sewer system had experienced a prior backup because such accumulations do not occur overnight and only occur with a backup. (*Id.* at PageID 1472–1475.) In fact, he mistakenly assumed that a camera investigation had been requested because of a known sewer back up. (*Id.* at PageID 1462.) He did not know when the backup would have occurred, nor did he have other evidence that a back-up had occurred. (*Id.* at PageID 1460, 1462, 1475.) He also concluded that the system did not have the "proper fall to . . . lead the waste sewage to the exterior of the home toward the city sewer." (*Id.* at PageID 1467.) He recommended that the sewer system on the Property needed to be replaced. (*Id.*)

The first time that the Horejses personally observed water enter the house was in March 2019 during the mold remediation process in the basement. (Doc. 37 at PageID 724.) Lauren Horejs stated that "when it was a strong rain, water would come in like a waterfall" in the unfinished part of the basement that was also unfinished when the Kitchins owned the Property. (*Id.*)

### E. Procedural History

The Horejses initiated this suit against the Kitchins by filing their Complaint in Hamilton County, Ohio Court of Common Pleas on September 5, 2019. (Doc. 2.) The Horejses asserted

---

evidence of water leaking out of the drop ceiling in the basement, but he saw no evidence of water in the drop ceiling himself. (*Id.* at PageID 1622.)

² A belly in a pipe is a section of pipe that has a dip or lower elevation than the ends of the pipe. (Doc. 46 at PageID 1307.)

claims for (1) breach of contract, (2) fraudulent misrepresentation and concealment, (3) negligent misrepresentation and/or concealment, and (4) unjust enrichment. The Kitchins removed the suit to this District Court and then filed an Answer denying liability on all counts. (Docs. 1, 4.)

On January 18, 2022, Plaintiffs filed a First Amended Complaint against the Kitchins adding Rick Arquilla as a Plaintiff, but they asserted the same four claims for relief. (Doc. 23.)[3] The Kitchins filed a second Answer again denying liability on all counts. (Doc. 25.)

On August 31, 2022, the Kitchins filed the pending Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 47.) The Horejses and Arquilla then filed their Memorandum in Response, to which the Kitchins filed a Reply. (Docs. 60, 62.)

## II. STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–587 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–324 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257

---

[3] The Court granted leave to the Horejs to join Arquilla pursuant to Rule 20 of the Federal Rules of Civil Procedure because discovery revealed that he paid for some of the remediation work performed at the Property. (Doc. 22.)

(1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also EEOC v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

### III. ANALYSIS

The Kitchins move for summary judgment on all claims without analyzing each claim separately on the merits. Instead, the Kitchins assert broadly that, pursuant to the doctrine of caveat emptor and the "as is" purchase of the Property by the Horejses, they cannot be liable on any of the claims asserted against them absent a showing that they committed fraud. Plaintiffs do not dispute that they must prove fraudulent misrepresentation or fraudulent concealment to succeed on their claims. (Doc. 60 at PageID 1704–1706.)[4]

---

[4] The Contract to Purchase did not contain a clause explicitly stating that the sale was an "as is" purchase. However, as the Horejses implicitly acknowledge, the effect is the same given that the Horejses waived their right to have the Property inspected and to make the contract contingent upon such inspection. (Doc. 2 at PageID 58–59.) Their realtor described their offer as an "as is" offer. (Doc. 37 at PageID 725.) There can be no claims for negligent misrepresentation or breach of contract in an "as is" purchase absent affirmative fraud. *See Rodgers v. Sipes*, No. 3-11-19, 2012-Ohio-3070, ¶ 41, 2012 WL 2553921, at *7 (Ohio App. July 2, 2012) (stating that as "as is" clause can bar a claim for breach of contract); *Tutolo v. Young,* No. 2010-L-118, 2012-Ohio-121, ¶ 52, 2012 WL 121081, at *9

12

The Supreme Court of Ohio explained as follows:

> The doctrine of *caveat emptor* precludes recovery in an action by the purchaser for a structural defect in real estate where (1) the condition complained of is open to observation or discoverable upon reasonable inspection, (2) the purchaser had the unimpeded opportunity to examine the premises, and (3) there is no fraud on the part of the vendor.

*Layman v. Binns*, 35 Ohio St. 3d 176, 519 N.E.2d 642, 642 at syllabus (1988). Moreover, "[w]hen a buyer contractually agrees to accept property 'as is,' the seller is relieved of any duty to disclose the property's latent conditions and only has the duty not to commit an affirmative fraud." *Stackhouse v. Logangate Prop. Mgt.*, 172 Ohio App. 3d 65, 872 N.E.2d 1294, 1299 (2007); *see also Kaye v. Buehrle*, 8 Ohio App. 3d 381, 457 N.E.2d 373, 376 (1983) ("[W]hen a buyer contractually agrees to accept property 'as is,' the seller is relieved of any duty to disclose."). "An 'as is' clause bars an action for 'passive nondisclosure' but does not shield the seller from an 'active' fraud or commission (as opposed to a fraud of omission), i.e., a misrepresentation or fraudulent concealment." *Hubbard Fam. Tr. v. TNT Land Holdings, LLC*, 2014-Ohio-772, ¶ 20, 9 N.E.3d 411, 420 (Ohio App. 2014). An "as is" clause "is inapplicable if the property disclosure form contains misrepresentations." *Id.*, 9 N.E.3d at 422.

The elements of fraud under Ohio law are:

> 1) a representation, or in a situation where there was a duty to disclose, a concealment of fact; 2) which fact is material to the transaction; 3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; 4) with the intent of misleading another into relying upon it; 5) justifiable reliance on the misrepresentation; and 6) a resulting injury proximately caused by the reliance.

*E-Poch Properties, LLC v. TRW Auto. U.S., LLC*, 286 F. App'x 276, 281 (6th Cir. 2008) (citation omitted). Plaintiffs "may present circumstantial evidence to show the required knowledge or

---

(Ohio App. Jan. 13, 2012) (same); *Mynes v. Brooks*, No. 08CA3211, 2009-Ohio-5017, ¶¶ 32–35, 2009 WL 3049401, at *6–7 (Ohio App. Sept. 14, 2009) (stating "as is" clause bars claim for fraudulent misrepresentation).

intent." *Seitz v. Harvey*, No. 25867, 2015-Ohio-122, ¶ 33, 2015 WL 223856, at *7 (Ohio App. Jan. 16, 2015).

Here, Plaintiffs point to the findings of the Roto-Rooter employees and other contractors they retained to remediate the house to argue that the Kitchins must have known about mold and water intrusion issues on their property. Their arguments ultimately, however, do not create a genuine issue of material fact that the Kitchins actually knew about and misrepresented or concealed defects in the home. The Court will start with the assertion that the Kitchins had to have known about mold and water intrusion issues in the basement. The Kitchens denied on the Residential Property Disclosure Form that they knew about any leaks, water accumulation, excess moisture, or defects or damage related to water intrusion. (Doc. 2 at PageID 70.)

It is undisputed that the Roto-Rooter contractors found significant amounts of mold in the basement several months after they purchased the Property. However, Plaintiffs have not established that the Kitchins knew about the mold. Most of the mold found by Roto-Rooter appears to latent, that is, hidden or concealed behind drywall, on the topside of ceiling tiles, and on carpet tack strips. (Doc. 39 at PageID 865–867, 880.) There is no evidence the mold existed when the Kitchins replaced the basement carpet in 2007. Nor is there evidence that they did any remodeling which would have required them to remove or replace the drywall on the exterior walls.

To the extent that the mold might have been visible on the baseboards when then Kitchins owned the Property, the evidence is not sufficient to create a genuine dispute of fact that the Kitchins knew it or took steps to conceal it. The Kitchins never tested for mold, David Kitchin denied being aware of a moldy smell in the basement, and Nancy Kitchin denied experiencing mold. (Doc. 34 at PageID 230; Doc. 35 at PageID 332.) Likewise, the Horejses

walked through the house four times before the closing, and Arquilla walked through the house one time before the closing, but none of them testified to seeing the mold. When the Horejses asked about an odor in the basement, Nancy Kitchin told them it was related to the cat's litter box. (Doc. 37 at PageID 720.) If the Horejses were concerned about the odor, the terms of the Contract to Purchase clearly put the burden on them as the buyers "**TO CONDUCT INSPECTIONS**" for issues "**THAT ARE OF CONCERN TO BUYER**." (Doc. 2 at PageID 59 (emphasis in the original).) Moreover, the Residential Property Disclosure Form explicitly stated that "**every home contains mold**" and that the "**purchaser is encouraged to have a mold inspection.**" (*Id.* at PageID 71 (emphasis in the original).)

The analysis is similar for Plaintiffs' argument that there was additional evidence of water intrusion in the basement sufficient to prove that the Kitchins must have known about the problem. To begin, the Horejses did not observe water actively enter into the basement until March 2019 during a heavy rainfall, approximately one-half year after they contracted to purchase the Property from the Kitchins. (Doc. 37 at PageID 724.) That fact alone is obviously not sufficient to establish that water had previously entered the home during rain showers when the Kitchins owned the Property, much less that the Kitchins knew about the instrusion. What the Horejses offer instead is insufficient circumstantial evidence and speculation.

Jason Garrett of Roto-Rooter detected the presence of water in the basement playroom in or around November 2018, but only using a thermal camera. (Doc. 39 at PageID 865.) Garrett did not testify that he would have detected the water absent a camera. Garrett also discovered a leaking crack in the plumbing stack that ran vertically from the kitchen to the basement bar, but that crack was concealed behind drywall. Steve Bostic and James Graham, a forensic architect and structural engineer, respectively, found signs of long-term water damage in areas that had

been concealed by drywall, including rotted wood and evidence that foam sheathing had been removed from the back exterior wall of the house. (Doc. 38 at 755–756, 773; Doc. 43 at PageID 1148–1149.) They both opined that the most likely reason to have removed the sheathing would have been because it was water saturated. (Doc. 38 at PageID 773; Doc. 43 at PageID 1106, 1148–1149.) Bostic candidly testified that he could not determine when the water damage occurred nor when the sheathing was removed. (*Id.* at PageID 1104, 1114.)

Even if this evidence is sufficient to suggest that there was water intrusion into the house prior to the time that the Horejses owned the Property, it does not establish that the Kitchins knew about the damage. The rotting wood and evidence of removed sheathing was discovered only when the drywall was removed. The Kitchins denied that they repaired or replaced drywall on the exterior walls when they owned the Property, and their testimony was not refuted. (Doc. 34 at PageID 230; Doc. 35 at PageID 332.) Conversely, Fe Alino, the first homeowner, averred that she and her husband hired contractors to finish the basement with framing, drywall, and drop ceilings, and she explained that they did not "continuously observe" the work to see how it was done. (Doc. 61 at PageID 1713.)[5] This evidence does not create a sufficient basis for a reasonable jury to conclude that the Kitchins—as opposed to the Alinos or the Horejses— removed the sheathing or that the Kitchins knew about water intrusion into the basement.

Plaintiffs' last argument concerns the sewer system. The Kitchins denied on the Residential Property Disclosure Form that they knew about any leaks, backups, or material problems with the sewer system. (Doc. 2 at PageID 70.) The Horejses point to evidence that Kevin Saylor, the Roto-Rooter plumber, determined in early 2019 that the sewer system on the Property was bellied out, retaining water, and full of waste and fecal matter. (Doc. 50-1 at

---

[5] In any event, evidence suggesting that a contractor should have been aware of a defect and should have notified the homeowner of the defect "is not probative of actual knowledge" on the part of the homeowner. *Sietz*, 2015-Ohio-122, ¶ 45, 2015 WL 2223856, at *9.

PageID 1461.) This was several months after the Horejses had closed on the house in September 2018. (Doc. 35 at PageID 330.) Saylor believed there had been a prior backup of the sewer system based on the amount of sewage in the pipe. (*Id.* at PageID 1472–1475.) Saylor admitted, however, that he did not know when this sewage backup would have occurred. (*Id.* at PageID 1460, 1462, 1475.) He admitted that the condition of the sewer system could not have been determined without the camera scope, in absence of a sewage backup. (Doc. 41 at PageID 1035.) The Horejses offer no physical evidence that sewage backed up into the home. In fact, Fe Alino, the Kitchins, and the Horejses all deny that there was a sewage backup when they lived on the Property. (Doc. 51 at PageID 1501; Doc. 34 at PageID 226, 230; Doc. 35 at PageID 335; Doc. 36 at PageID 430.) As such, there is not sufficient evidence for a jury to conclude that the Kitchens knew about and concealed or misrepresented the condition of the sewer system on the Residential Property Disclosure Form.

In sum, Plaintiffs have not provided evidence of fraud sufficient to overcome the doctrine of caveat emptor and the "as is" nature of the sale. The Kitchins disclosed to the Horejses prior to the sale of the Property the discovery of a crack in the chimney bricks and provided the Horejses with a copy of a structural engineer's 2016 report on the issue. The Horejses agreed to purchase the Property, despite knowledge of the prior chimney brick crack and of an odor in the basement, based only on their own "walk-through the [P]roperty." (Doc. 2 at PageID 59.) They expressly waived the right to make the sale contingent upon a home inspection ignoring the warnings in the Contract to Purchase and the Residential Property Disclosure Form to have inspections conducted. (*Id.*) The forensic investigations conducted at the direction of Arquilla and the Horejses in late 2018 and early 2019 revealed a host of mold and water intrusions problems, but the evidence was not sufficient to establish when the problems first arose nor

17

prove that the Kitchins knew about the problems and misrepresented or concealed them. Without such evidence, there are no genuine disputes of material fact, and Plaintiffs cannot establish fraud as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, the Kitchins' Motion for Summary Judgment (Doc. 47) is **GRANTED**.

**IT IS SO ORDERED.**

BY THE COURT:

S/Susan J. Dlott
Susan J. Dlott
United States District Judge